## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| AK and CK, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | NO. 3:18-cv-01238 |
| | ) | |
| BEHAVIORAL HEALTH SYSTEMS, | ) | |
| INC., BLUE CROSS BLUE SHIELD OF | ) | |
| ALABAMA, INC. and AMERICAN | ) | |
| FAMILY CARE, INC. GROUP | ) | |
| HEALTHCARE PLAN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff C.K. is an employee of Defendant American Family Care, Inc. (AFC), and a participant in its Group Healthcare Plan (the Plan), which is administered by Defendants Blue Cross and Blue Shield of Alabama, Inc. (BCBSAL) and Behavioral Health Systems, Inc. (BHS). C.K. brings this case under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq., and the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA), 29 U.S.C. § 1185a, seeking to have the Plan cover the cost of residential eating disorder treatment for his daughter, Plaintiff A.K.

Before the Court are four cross-motions for judgment on the administrative record. Plaintiffs have filed a motion for judgment on the administrative record and, in the alternative, for an order of remand (Doc. No. 65), to which AFC, BHS, and BCBSAL have responded (Doc. Nos. 69–71), and Plaintiffs have replied (Doc. Nos. 77–79). AFC, BHS, and BCBSAL have filed motions for judgment on the administrative record (Doc. Nos. 59, 61, 63), to which Plaintiffs have responded (Doc. Nos. 72–74), and AFC, BHS, and BCBSAL have replied (Doc. Nos. 75, 76, 80).

Because the parties' briefing is inextricably interrelated, the Court considers all four motions together. For the reasons that follow, AFC's, BHS's, and BCBSAL's motions will be granted, and Plaintiffs' motion will be denied.

## I. Background

During her junior year of high school, A.K., a 17-year-old Tennessee resident, developed an eating disorder. (AR 259–60, 559.) A.K.'s family became concerned about her wellbeing and believed that residential treatment was necessary to keep A.K.'s condition from worsening. (AR 12–21.) A.K. completed a treatment program at Remuda Ranch, a specialized residential facility in Arizona, from June through August 2016 (AR 162), the cost of which her father, C.K., sought to have covered by the Plan (AR 46–50).

### A. Applicable Plan Provisions

The Plan is a self-funded "employee welfare plan" as defined by ERISA, 29 U.S.C. § 1002(1), and is sponsored by AFC. (AR 154–55, 620–22.)[1] The Plan provides medical and surgical benefits to participants under the American Family Care, Inc. Group Healthcare Plan, which is administered by BCBSAL. (AR 154–55.) Since 2012, the Plan's coverage for mental health and substance abuse treatment has been provided under the American Family Care, Inc. Employee Assistance Program and Mental & Nervous Group Benefits, which are administered by BHS. (AR 573–76; 619–25.)

The administrative record contains three documents describing the benefits available under the Plan: the American Family Care Inc. Health benefits booklet (Benefits Booklet) (AR 98–156); the American Family Care, Inc. Employee Assistance Program and Mental and Nervous Group

---

[1]     The Transcript of the Administrative Record (Doc. No. 51) is referenced herein by the abbreviation "AR." All page numbers cited in the AR refer to the Bates stamp at the bottom right corner of each page.

2

Benefits Description Addendum to Employee Medical Plan Booklet (Addendum D) (AR 573–76); and the Behavioral Health Systems, Inc. American Family Care, Inc. Covered Conditions (Addendum C) (AR 577–80). The "plan documents" for the portion of the Plan providing medical and surgical benefits include the Benefits Booklet (AR 98–156), the Administrative Services Agreement between BCBSAL and AFC (AR 688–710), any benefit matrices related to the administration of the Plan (AR 711–13), and any draft benefit booklets that AFC and BCBSAL treat as operative. (AR 152.) For purposes of compliance with ERISA, the Plan designates AFC as the sponsor and plan administrator (AR 154, 693, 700) and designates BCBSAL as the claims administrator for medical and surgical benefits (AR 689) and BHS as the claims administrator for mental health and substance abuse benefits (AR 571, 577).

### 1.    Medical and Surgical Benefits Administered by BCBSAL

The Benefits Booklet provides that "[t]he plan will only pay for care that is medically necessary" (AR 115), defined as treatment that BCBSAL has determined is:

- Appropriate and necessary for the symptoms, diagnosis or treatment of your medical condition;

- Provided for the diagnosis or direct care and treatment of your medical condition;

- In accordance with the standards of good medical practice accepted by the organized medical community;

- Not primarily for the convenience and/or comfort of you, your family, your physician, or another provider of services;

- Not "investigational"; and

- Performed in the least costly setting, method, or manner, or with the least costly supplies, required by your medical condition. A "setting" may be your home, a physician's office, an ambulatory surgical facility, a hospital's outpatient department, a hospital when you are an inpatient, or another type of facility providing a lesser level of care. Only your medical condition is considered in deciding which setting is medically necessary. Your financial or family situation, the distance you live from a hospital or other facility, or any other non-medical factor is not considered. As your medical condition changes, the setting you need may also change. Ask your physician if any

of your services can be performed on an outpatient basis or in a less costly setting.

(AR 151–52.)

The Exclusions section of the Benefits Booklet states that the medical portion of the Plan does not provide benefits for, among other things, "[c]are and treatment for mental health disorders or disease (including substance abuse)" or for "[s]ervices or supplies furnished by a skilled nursing facility." (AR 127, 130–31.) Similarly, the benefit matrix that outlines the Plan's medical coverage, which became effective on January 1, 2016, states that "Mental Health Disorders and Substance Abuse benefits are not administered by [BCBSAL.]" (AR 713.)

### 2. Mental Health Benefits Administered by BHS

Under a Self-Funded Health Change Agreement between BCBSAL and AFC (AR 710) and a Managed Care/Employee Assistance Plan Agreement between AFC and BHS (AR 619–25), the mental health benefits AFC provides to its employees are administered by BHS. The role of BHS in administering mental health benefits under the Plan is set forth in the Managed Care/Employee Assistance Plan Agreement, which provides that, effective January 1, 2012, BHS will "perform all central claims processing functions for Covered Services rendered through its Participating Providers" and "make payments made through [AFC]'s health plan to the provider[s] . . . ." (AR 619–21.) That Agreement also provides that "[AFC]'s Benefit Plan shall require pre-certification approval by BHS as a condition of coverage of Covered Services" and AFC "shall pay, or cause to be paid BHS, all charges submitted by BHS . . . ." (AR 621–22.) Mental health benefits are administered by BHS under Addendum C (AR 577–80), Addendum D (AR 573–76), and the Managed Care/Employee Assistance Plan Agreement (AR 619–25).

Addendum D states that "Mental Health Substance Abuse [and Employee Assistance Plan] benefits are only available as detailed in this Addendum" and "are payable separate from [AFC]'s

4

medical group benefits" and notes that "BHS also administers its own appeals process for related claims in strict accordance with applicable governing laws." (AR 573–74.) Addendum D also provides that "[a]ll benefits are subject to medical necessity review and approval by BHS" and "[c]ertain services require precertification" and "benefits may not be paid" if employees do not obtain precertification. (AR 573.) Addendum C states that the Plan does not cover "[r]esidential psychiatric care, defined as a program or physical environment providing 24-hour monitoring/supervision/behavior modification for a term extending beyond that required for acute inpatient stabilization." (AR 578–79.) Addendum D also states that the Plan excludes "residential and nursing home or custodial care." (AR 575.)

## B.    Factual History

### 1.    BHS Denies Precertification

From May through July 2016, BCBSAL received inquiries from several potential mental health providers regarding A.K.'s mental health benefits under the Plan. BCBSAL advised each provider that "benefits for mental/nervous/substance abuse are provided by [BHS]" and provided contact information for BHS. (AR 714, 716, 718, 720, 722, 726, 728.) On July 12, 2016, C.K. contacted BCBSAL to inquire about claims from A.K.'s pediatrician that had not been paid by BCBSAL. (AR 732.) BCBSAL informed C.K. that the claims in question had been classified as mental health treatment, that BCBSAL did not provide benefits for mental health treatment, and that such benefits were provided by BHS. (Id.)

During the same time period, BHS call records reflect that it received inquiries about A.K.'s benefits from residential eating disorder treatment centers in Utah, Texas, Arizona, and Colorado, including several calls from Remuda Ranch, a "'highly specialized' eating disorder treatment facility" in Arizona. (AR 75–76.) Call notes from a June 7, 2016 phone call with a Remuda Ranch employee reflect that a BHS representative "reiterated that [A.K.] has no

5

residential ben[efit]s and that higher levels of care require precert[ification]." (AR 76.) The Remuda Ranch employee told BHS that A.K. was likely to be admitted to Remuda Ranch's partial hospitalization program. (Id.)

BHS received an assessment of A.K.'s condition from Remuda Ranch on June 9, 2016. (AR 77, 603.) BHS's medical director reviewed the assessment and denied coverage on the grounds that the Plan does not provide for residential mental health treatment. (AR 77.) The medical director "also denied [inpatient] and [partial hospitalization program treatment] due to lack of med[ical] nec[essity]." (Id.) A BHS representative called A.K.'s mother and explained that A.K. had no residential treatment center benefits and that, based on the BHS medical director's review of Remuda Ranch's clinical assessment, A.K. did not meet the criteria for inpatient treatment or a partial hospitalization program. (Id.) When A.K.'s mother asked for clarification of BHS's criteria to approve such treatment, the BHS representative explained that A.K. did not meet the criteria because, according to Remuda Ranch's clinical assessment, A.K.'s "current body weight [was] not less than 75% of ideal body weight[,]" "her BMI [was] not below 16[,]" and she was "not experiencing significant active biomedical complications such as electrolyte imbalances, cardiac arrhythmias, esophageal tears, [or] low [blood pressure.]" (AR 77–78.) A.K.'s mother disagreed with this assessment and asked BHS to consider records from A.K.'s pediatrician. (AR 78.) In a call with A.K.'s parents on June 10, 2016, BHS confirmed that the records from A.K.'s pediatrician had been received and would be reviewed by BHS's medical director and again explained that residential treatment was not covered by the Plan. (AR 79.)

BHS reviewed the records from A.K.'s pediatrician, which included "a diagnosis of 'abnormal weight loss[,]' . . . [b]radycardia[,] . . . eating disorder[,] and acute otitis media[,]" and found an "intensive outpatient setting" to be the recommended level of care. (AR 70) When a BHS

representative contacted A.K.'s parents to share this information, they expressed frustration and stated that "[A.K.]'s pediatrician [was] recommending residential care." (AR 80.) The BHS representative reiterated "multiple times that it is not that residential care is available and BHS is denying it, it is that AFC's plan has no residential benefits." (Id.) C.K. asked about treatment options at the Renfrew Center in Nashville, Tennessee, and the BHS representative explained that the Renfrew Center was out of network, but that BHS could attempt to negotiate a single case agreement to provide coverage if Renfrew could offer intensive outpatient treatment. (Id.) A.K.'s parents asked for more information about intensive outpatient treatment options, but also stated that "they may have to pay privately for 'what [they] think is best for [their] daughter.'" (Id.)

On June 17, 2016, BHS informed C.K. that it had negotiated a single case agreement with the Renfrew Center to provide intensive outpatient treatment for A.K. in their adolescent program. (AR 81.) C.K. informed BHS that the family had decided "to private pay for [A.K.] to enter residential treatment at Remuda Ranch[,]" beginning June 21, 2016. (Id.) Treatment records from Remuda Ranch reflect that, at the time of admission, A.K. weighed 103 pounds, which was 82.4% of her ideal weight of 125 pounds. (AR 259–60.) She was diagnosed with Anorexia Nervosa and bradycardia and her body mass index was 17.14. (AR 346.) Her supine blood pressure was 105/66, and her standing blood pressure was 110/70. (Id.) A.K. resided at Remuda Ranch from June 21 through August 5, 2016, when she was discharged as having completed treatment. (AR 162.)

### 2. BHS Denies Reimbursement Claim

On October 14, 2016, BHS received a request from C.K. for reimbursement of $159,061.55, which was accompanied by medical records from A.K.'s treatment at Remuda Ranch. (AR 46–50, 603.) BHS's medical director reviewed the medical records and "again determined that medical necessity criteria [for residential treatment] were not met[.]" (AR 603.) BHS denied the claim on October 28, 2016, explaining that, based on the information provided,

"treatment could be rendered effectively at a different level or frequency of care." (AR 608.) BHS

also explained that A.K could obtain "[t]he clinical rationale for this decision" upon written request

and provided information to appeal the decision. (AR 608–09.)

After Plaintiffs requested BHS's clinical rationale for the denial, BHS provided the

following response in a letter dated November 3, 2016:

> The BHS Acute Inpatient Criteria for Eating Disorders state that the patient must
> have a primary diagnosis of Anorexia Nervosa, Bulimia Nervosa, or Unspecified
> Feeding or Eating Disorder, as defined by the DSM-5. Diagnostic criteria must be
> documented by the treating provider within 24 hours of admission describing the
> patient's condition at the time of admission. In addition, all of the following must
> be met:
>
> 1. A current body weight of less than 75% ideal body weight and/or a body
>    mass index (BMI) of <16; and
>
> 2. Significant active biomedical complications related to the eating disorder,
>    including but not limited to electrolyte imbalances, cardiac arrhythmias,
>    esophageal tear, orthostatic changes, and/or low blood pressure (<90/60 in
>    adults or <80/50 in children/adolescents age 17 or less), for which treatment
>    is not more appropriately provided on an inpatient medical floor (i.e.,
>    telemetry); and
>
> 3. Eating disorder symptoms and behaviors can be reasonably expected to
>    significantly improve with treatment at the acute inpatient level of care.

(AR 606; see also AR 73.) The letter explained that BHS had determined that "inpatient services

[were] not medically necessary" because "[m]edical records document that [A.K.'s] body mass

index was above 17 on the day of admission and increased throughout the stay. It was never below

16. [Her] weight at admission was 103, which [was] 82.4% of [her] estimated ideal weight of 125."

(AR 606.) Additionally, A.K.'s treatment at Remuda Ranch did not meet BHS's criteria for

"continued inpatient stay," which required "face-to-face family therapy[.]" (AR 607; see also

AR 73–74.) On November 14, 2016, BHS sent A.K. another letter containing the same information

as the denial letter sent October 28, 2016. (AR 604–05.) On November 21, 2016, BHS sent A.K.

a letter summarizing its communications with her parents about her "admission to Remuda Ranch[,]" and explaining that BHS had denied the claim because the Plan did not cover residential treatment and she did not meet the medical necessity criteria for acute inpatient treatment. (AR 603.)

On April 26, 2017, Plaintiffs appealed BHS's denial of their claim, arguing that A.K.'s medical condition was life threatening and required residential treatment. (AR 362–569.) An independent physician with BHS reviewed Plaintiffs' appeal letter and A.K.'s medical record and again found that BHS's medical necessity criteria for acute inpatient treatment were not met. (AR 600.) On May 19, 2017, BHS sent Plaintiffs a letter upholding its denial of benefits, explaining:

> Based on the medical records provided, the clinical rationale for this determination is as follows: The clinical information describes the patient at the time of admission as 5 feet 5 inches tall, with a weight of 103 lbs. Her [body mass index] was 17.14. Her ideal body weight was 125 lbs. The patient was diagnosed with Anorexia (restricting and purging type). She was counting calories, averaging 1,000 kilocalories per day. She had increased her daily exercise, but stopped this over-exercising behavior three weeks prior to admission. She smoked cigarettes. Her reported substance use was positive for cannabis and alcohol use. She has no reported specific food rituals. The patient was described as having bradycardia as her primary medical issue, but with complete maintenance of blood pressure. Her EKG showed sinus bradycardia without any other significant changes. At the time of admission on [June 21, 2016,] the patient was significantly above 75% of her ideal body weight. There are no documented severe vital sign abnormalities. She had discontinued some of her eating disorder behaviors, including over-exercising and purging, prior to coming to the facility. She was psychiatrically stable with no evidence of perceptual alterations.

(Id.) The letter also informed Plaintiffs of their rights to seek additional review or a civil action under § 502(a) of ERISA. (AR 601.)

## C. Procedural History

Plaintiffs initiated this action by filing a complaint under ERISA, 29 U.S.C. § 1001 et seq., and the MHPAEA, 29 U.S.C. § 1185a, alleging that the denial of their claims violates the

MHPAEA and the terms of the Plan. (Doc. No. 1, ¶ 2.) Plaintiffs seek payment of their denied claims under 29 U.S.C. § 1123(a)(1)(B) and injunctive and declaratory relief concerning Defendants' alleged violations of the MHPAEA under 29 U.S.C. § 1123(a)(3). (Id. at ¶ 3.)

## II.     Standard of Review

ERISA establishes a "uniform regulatory regime over employee benefit plans" in order to "protect beneficiaries of [those] plans while providing employers with uniform national standards for plan administration." Milby v. MCMC LLC, 844 F.3d 605, 609 (6th Cir. 2016) (quoting Aetna Health Inc. v. Davila, 542 U.S. 200, 208 (2004)). To that end, ERISA requires plans to "provide certain presuit procedures for reviewing claims after participants submit proof of loss (internal review)." Heimeshoff v. Hartford Life & Accident Ins. Co., 571 U.S. 99, 105 (2013) (citing 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1 (2012)). When the internal review has been exhausted, a beneficiary can bring an action in federal court under 29 U.S.C. § 1132(a)(1)(B) to recover benefits owed under the plan. Id. at 102 (citing 29 U.S.C. § 1132(a)(1)(B)). However, "ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989). In Bruch, the Supreme Court held that the applicable standard will depend on the terms of the relevant benefit plan: "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan[,]" a challenge to a denial of benefits under § 1132(a)(1)(B) will "be reviewed under a de novo standard[.]" Id. at 115. "When the plan vests the administrator with discretion to interpret the plan . . . , the court reviews the benefits denial under the 'arbitrary and capricious' standard." Corey v. Sedgwick Claims Mgmt. Servs., Inc., 858 F.3d 1024, 1027 (6th Cir. 2017).

While the medical and surgical portion of the Plan grants discretionary authority to BCBSAL (AR 675, 700), BCBSAL did not participate in the denial of Plaintiffs' claims, which

were handled by BHS alone under the mental health and substance abuse portion of the Plan. BHS does not claim to have discretionary authority and has addressed the de novo standard of review in its briefing. (Doc. No. 62, PageID# 1604.) Therefore, the Court will apply that standard. See Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 613 n.3 (6th Cir. 1998) (applying de novo review where parties did not contest district court's finding that de novo review was appropriate); Krolnik v. Prudential Ins. Co. of Am., 570 F.3d 841, 842 (7th Cir. 2009) (declining to "look behind" parties' agreement that de novo standard applied to review of plaintiff's denial-of-benefits claim).

In applying the de novo standard of review in an ERISA action, the court's role is to determine whether the plan administrator made the correct decision in denying benefits. Hoover v. Provident Life & Acc. Ins. Co., 290 F.3d 801, 808–09 (6th Cir. 2002). "The administrator's decision is accorded no deference or presumption of correctness. The review is limited to the record before the administrator and the court must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." Id. at 809 (citation omitted). The "de novo standard of review applies to the factual determinations as well as to the legal conclusions of the plan administrator." Wilkins, 150 F.3d at 613 (citing Rowan v. Unum Life Ins. Co., 119 F.3d 433, 435 (6th Cir. 1997)).

A motion for judgment on the administrative record is the appropriate procedural method for judicial review in ERISA actions. Id. at 619. To succeed in a claim for benefits under ERISA, Plaintiffs must prove by a preponderance of evidence that they are entitled to benefits under the terms of the plan. Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps., 741 F.3d 686, 700–01 (6th Cir. 2014); O'Neill v. Unum Life Ins. Co. of Am., No. 18-1382, 2018 WL 7959523, at *3 (6th Cir. Nov. 19, 2018).

**III.      Analysis**

In their motion for judgment on the administrative record, Plaintiffs argue under 29 U.S.C. § 1132(a)(3) that the Plan violates the MHPAEA, id. § 1185a, and ERISA's requirements for summary plan descriptions (SPDs), id. § 1022(a), and "seek declaratory [and injunctive] relief in the form of an order finding the Plan to be in violation of" those statutes and "an order instructing the Plan to correct and cure its . . . violations consistently with its fiduciary duties." (Doc. No. 66, PageID# 1646–47.) They also argue under 29 U.S.C. § 1132(a)(1)(B) that the denial of benefits to A.K. violates the terms of the Plan, ERISA's claims procedures, 29 C.F.R. § 2560.503-1, and the MHPAEA and seek payment of their claims or, in the alternative, remand "for reconsideration of Plaintiffs' claims consistently with the MHPAEA and ERISA's claims procedures." (Doc. No. 66, PageID# 1646.)

All three defendants argue that they are entitled to judgment as a matter of law because the record shows that BHS and AFC have fully complied with the MHPAEA, ERISA, and the terms of the Plan in denying Plaintiffs' claim. (Doc. Nos. 60, 62, 64.) BCBSAL also moves for judgment as a matter of law on the basis that it had no "responsibility for the administration of mental health and substance abuse claims" and was not involved in the denial of benefits in this case. (Doc. No. 64.)

**A.      Claims under ERISA's SPD Requirements and Claims Procedures**

The complaint (Doc. No. 1) does not allege violations of ERISA's SPD requirements, 29 U.S.C. § 1022(a), or ERISA's claims procedures, 29 C.F.R. § 2560.503-1. Instead, Plaintiffs raise these claims for the first time in their motion for judgment on the administrative record. The Court has already declined to consider issues that were not raised in the pleadings in its denial of Defendants' motions to dismiss, noting that the issues would not be properly before the Court "[u]ntil an amended complaint is filed" under Rule 15. (Doc. No. 38, PageID# 609.) Plaintiffs

12

never moved to amend their complaint to add claims under ERISA's SPD provision or claims procedures and are not entitled to raise those claims for the first time in a dispositive motion. Accordingly, the Court will not consider those claims.

### B.   Claim Under 29 U.S.C. § 1132(a)(3)

Plaintiffs allege that the Plan violates the MHPAEA by imposing more stringent requirements on mental health and substance abuse benefits than on medical and surgical benefits. The MHPAEA was "designed to end discrimination in the provision of coverage for mental health and substance use disorders as compared to medical and surgical conditions in employer-sponsored group health plans[.]" Coal. For Parity, Inc. v. Sebelius, 709 F. Supp. 2d 10, 13 (D.D.C. 2010). Although there is no private right of action under the MHPAEA, "'Congress enacted [the MHPAEA] as an amendment to ERISA, making it enforceable through a cause of action under 29 U.S.C. § 1132(a)(3)[.]'" Wilson v. Anthem Health Plans of Ky., Inc., No. 3:14-CV-743, 2017 WL 56064, at *2 (W.D. Ky. Jan. 4, 2017) (first alteration in original) (quoting Joseph F. v. Sinclair Servs. Co., 158 F. Supp. 3d 1239, 1259 n.118 (D. Utah 2016)). Defendants argue that Plaintiffs' claim under § 1132(a)(3) seeks the same relief—payment of benefits—as their claim under § 1132(a)(1)(B) and is therefore barred under Varity Corp. v. Howe, 516 U.S. 489, 509–15 (1996). (Doc. No. 62, PageID# 1596; Doc. No. 64, PageID# 1636.) Plaintiffs reply that their § 1132(a)(3) claim is not for benefits, but "seek[s] declaratory relief in the form of an order declaring" that the Plan itself violates the MHPAEA and requiring Defendants to "correct the errors and implement appropriate remedies." (Doc. No. 78, PageID# 1727; Doc. No. 77, PageID# 1724–25.) Plaintiffs argue that seeking such relief in addition to a claim for benefits under § 1132(a)(1)(B) is permissible "because § 1132(a)(1)(B) would not provide the complete relief" they seek. (Doc. No. 73, PageID# 1706.)

Section 1132(a)(3) provides that

> [a] civil action may be brought . . . by a participant, beneficiary, or fiduciary
>
> (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or
>
> (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3). Section 1132(a)(3) is intended to "act as a safety net, offering appropriate equitable relief for injuries caused by violations that [§ 1132] does not elsewhere adequately remedy." Varity, 516 U.S. at 512. In Varity, the Supreme Court held that the proper remedy for a claim related to the interpretation of plan documents and the payment of benefits was encompassed in § 1132(a)(1)(B), while § 1132(a)(3) provided a remedy for "other breaches of other sorts of fiduciary obligation[.]" Id.

The Sixth Circuit has interpreted Varity to "limit[ ] the applicability of § 1132(a)(3) to beneficiaries who may not avail themselves of § 1132's other remedies" and to hold that plaintiffs may not bring a cause of action under § 1132(a)(3) where § 1132(a)(1)(B) provides a potential remedy for the alleged injury. Wilkins, 150 F. 3d at 615; see also Donati v. Ford Motor Co., Gen. Retirement Plan, Retirement Comm., 821 F.3d 667, 673–74 (6th Cir. 2016) (plaintiff could not pursue a claim under § 1132(a)(3) because she sought the same relief in her benefits claim under § 1132(a)(1)(B)); Tackett v. M&G Polymers, USA, LLC, 561 F.3d 478, 491 (6th Cir. 2009) (relief under § 1123(a)(3) not appropriate where plaintiff merely "repackages" a § 1123(a)(1)(B) benefits claim). However, denial of a § 1132(a)(3) claim is appropriate only if the alleged injury to the plaintiff may be completely remedied by a claim under § 1132(a)(1)(B). See Hill v. Blue Cross & Blue Shield of Mich., 409 F. 3d 710, 718 (6th Cir. 2005) (finding that "only injunctive relief of the type available under § 1132(a)(3)" would remedy violations that were alleged on a plan-wide basis).

A claim to enforce the MHPAEA seeks to enjoin or redress violations of ERISA itself, not to enforce the terms of a plan; thus, it is properly brought under § 1132(a)(3) because it seeks remedies unavailable under § 1132(a)(1)(B). See James C. v. Anthem Blue Cross & Blue Shield, No. 2:19-cv-38, 2020 WL 3452633, at *5 (D. Utah June 24, 2020) (finding that plaintiffs' requests for equitable relief under § 1132(a)(3) including, among other things, injunctions ordering defendants to stop violating the MHPAEA and reform the terms of the plan to comply with the statute's requirements, sought different relief and could be pursued with claims for denial of benefits under § 1132(a)(1)(B)). To the extent that Plaintiffs allege the terms of the Plan violate the MHPAEA and seek declaratory and injunctive relief to bring those terms into compliance with the MHPAEA (Doc. No. 1, ¶¶ 97–98), such claims do not merely "repackage" Plaintiffs' claims for benefits because they seek relief that is not available under § 1132(a)(1)(B). They are properly brought under § 1132(a)(3).

The MHPAEA does not mandate that plans provide mental health benefits, but it "requires group health plans and health insurance issuers to ensure that the financial requirements (deductibles, copays, etc.) and treatment limitations applied to mental health benefits be no more restrictive than the predominant financial requirements and treatment limitations applied to substantially all medical and surgical benefits covered by the plan or insurance." New York State Psychiatric Ass'n Inc. v. UnitedHealth Grp., 798 F.3d 125, 128 (2d Cir. 2015) (citing 29 U.S.C. § 1185a(a)(3)(A)). Thus, a group health plan

> that provides both medical/surgical benefits and mental health or substance use disorder benefits may not apply any financial requirement or treatment limitation to mental health or substance use disorder benefits in any classification that is more restrictive than the predominant financial requirement or treatment limitation of that type that applied to substantially all medical/surgical benefits in the same classification. . . .

29 C.F.R. § 2590.712(c)(2)(i).

"Treatment limitations" may be quantitative or non-quantitative and include "limits on benefits based on the frequency of treatment, number of visits, days of coverage, days in a waiting period, or other similar limits on the scope of duration of treatment." Id. § 2590.712(a). Restrictions based on facility type are considered nonquantitative treatment limitations (NQTLs). Id. § 2590.712(c)(4)(ii)(H); see also id. § 2590.712(a) (defining quantitative treatment limitations as those "which are expressed numerically (such as 50 outpatient visits per year)," and nonquantitative treatment limitations as those "which otherwise limit the scope or duration of benefits for treatment under a plan or coverage").

A plan "may not impose a [NQTL] with respect to mental health or substance use disorder benefits in any classification unless, under the terms of the plan . . . any processes, strategies, evidentiary standards, or other factors used in applying the [NQTL] to mental health or substance use disorder benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits in the classification." Id. § 2590.712(c)(4)(i).

Plaintiffs' claim that AFC, BCBSAL, and BHS have violated the MHPAEA is based on the premise that Addenda C and D—which describe the Plan's mental health and substance abuse coverage—are not part of the Plan and, therefore, that the Plan does not provide mental health and substance abuse benefits. Plaintiffs argue that the Benefits Booklet for the medical portion of the Plan (AR 628–86) is the Plan's "controlling document" and thus must include all coverage information for both medical and surgical and mental health and substance abuse benefits within its four corners (Doc. No. 66, PageID# 1648–49). Plaintiffs argue that Benefits Booklet fails to provide mental health coverage in parity with medical and surgical benefits by (1) "expressly exclud[ing] coverage of '[c]are and treatment for mental health disorders or disease (including

substance abuse)'"; (2) "provid[ing] participants with detailed information about their health benefits" while remaining "entirely silent about mental health and addiction benefits"; and (3) "giv[ing] participants detailed information about how to file medical claims and appeals" but not mental health claims and appeals (Id. (citing AR 646–50, 660, 662–68).)

These arguments are entirely without merit. First, to the extent Plaintiffs argue that the Plan violates the MHPAEA by not providing mental health benefits, that argument must fail because plans are not required to do so under the MHPAEA. Plaintiffs' second and third arguments are nonsensical, asking the Court first to look to Addenda C and D to find that the Plan provides mental health coverage—which it must for the MHPAEA to apply at all—then ignore the terms that Addenda C and D set out for mental health coverage because they are not part of the Benefits Booklet.

"[T]here is no requirement . . . that the terms of an ERISA plan be contained in [a] single document," and no reason for the Court to ignore the terms set out in Addenda C and D. Rinard v. Eastern Co., 978 F.2d 265, 268 n.2 (6th Cir. 1992); Health Cost Controls of Illinois, Inc. v. Washington, 187 F.3d 703, 712 (7th Cir. 1999) (noting that "often the terms of an ERISA plan must be inferred from a series of documents none clearly labeled as 'the plan'"). When those documents are properly considered, the Plan (1) provides coverage for mental health and substance use disorders under Addenda C and D; (2) provides information about mental health and substance abuse benefits under Addenda C and D; and (3) explains that mental health claims are to be filed directly with BHS, which "administers its own appeals process," and that appeals procedure documents "are available upon request to BHS." (AR 574.) Consideration of all Plan documents would make clear to an ordinary Plan participant that the Plan includes medical and surgical benefits administered by BCBSAL and governed by the terms of the Benefits Booklet and mental

health and substance abuse benefits administered by BHS and governed by the terms of Addenda C and D. Therefore, the Plaintiffs have not shown that the terms of the Plan violate the MHPAEA.

### C.   Claims Under § 1132(a)(1)(B)

Plaintiffs also bring claims for payment of benefits under § 1132(a)(1)(B) alleging that BHS improperly denied their claims in violation of the MHPAEA and the terms of the Plan. (Doc. No. 66, PageID# 1649.) As explained below, Defendants are also entitled to judgment on these claims.

### 1.   Whether Denial of Residential Treatment Violated the MHPAEA

Plaintiffs argue that BHS violated the MHPAEA by excluding residential psychiatric services at Remuda Ranch even though analogous medical services would have been covered by the Plan. (Doc. No. 66, PageID# 1650–52.) The MHPAEA's implementing regulations state that skilled nursing facilities are the medical and surgical analogue for residential mental health treatment centers. See B.D. v. Blue Cross Blue Shield of Ga., No. 1:16-cv-00099, 2018 WL 671213, at *4 (D. Utah Jan. 31, 2018) (citing Preamble, Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, 78 Fed. Reg. 68,240, 68,247 (Nov. 13, 2013)).

The Plan excludes treatment at both residential mental health facilities and skilled nursing facilities. (AR 131, 579.) Plaintiffs thus do not (and could not) argue that the Plan imposes greater restrictions on residential mental health treatment than it does on skilled nursing facilities—in fact, Plaintiffs argue that "the Plan's exclusion of skilled nursing care is irrelevant[.]" (Doc. No. 73, PageID# 1705.) Instead, Plaintiffs point to the Benefits Booklet's definition of "Medically Necessary" services, which provides:

> [A service is] medically necessary only if we determine that it is . . . [p]erformed in the least costly setting, method, or manner, or with the least costly supplies, required by your medical condition. A "setting" may be your home, a physician's

office, an ambulatory surgical facility, a hospital's outpatient department, a hospital when you are an inpatient, or another type of facility providing a lesser level of care. . . .

(AR 681–82.) Plaintiffs assert that Remuda Ranch "occupies the space between outpatient care and inpatient hospitalization," making it analogous to "another type of facility providing a lesser level of care." (Doc. No. 66, PageID# 1652.) Plaintiffs contend that BHS's failure to consider Remuda Ranch "consistently with the Plan's coverage of care at 'another type of facility providing a lesser [level] of care'" violates the MHPAEA. (<u>Id.</u>) This argument is based on a misinterpretation of the Plan's provisions.

A plain reading of the Benefits Booklet's definition of medical necessity shows that the reference to "another type of facility providing a lesser level of care" is not an assurance that any medical treatment provided in such a setting will be covered; rather, it indicates that sometimes "another type of facility providing a lesser level of care" will be the least costly setting for medically necessary treatment provided for under the Plan. The MHPAEA's implementing regulations identify skilled nursing services as the analogue to residential mental health treatment, and the Plan treats them with parity by excluding both. <u>Cf. Danny P. v. Catholic Health Initiatives</u>, 891 F.3d 1155, 1158 (9th Cir. 2018) (holding that a plan violated MHPAEA by covering medical and surgical treatment at skilled nursing facilities but excluding residential mental health treatment). Accordingly, BHS did not violate the MHPAEA when it denied A.K.'s treatment at Remuda Ranch under the Plan's residential treatment exclusion for mental health services. Defendants are entitled to judgment as a matter of law on this claim.

**2.     Whether Denial of Residential Treatment Violated the Terms of the Plan**

Plaintiffs argue that BHS violated the terms of the Plan by "failing to consider Plaintiffs['] claim consistently with the Plan's coverage of care at 'another type of facility providing a lesser

[level] of care," as set out in the Benefits Booklet. However, the provision Plaintiffs cite is from the medical and surgical benefits portion of the Plan, which is administered by BCBSAL. Mental health and substance abuse benefits are governed by Addenda C and D and are administered by BHS. Addendum D provides that the Plan does not cover "[r]esidential psychiatric care, defined as a program or physical environment providing 24-hour monitoring/supervision/behavior modification for a term extending beyond that required for acute inpatient stabilization." (AR 578–79.) Plaintiffs do not dispute that Remuda Ranch meets the Plan's definition of residential psychiatric care set out in Addendum D. (Doc. No. 66, PageID# 1644.) Accordingly, under BHS's criteria articulated in Addendum D, A.K.'s treatment at Remuda Ranch would only be covered by the Plan if she required acute inpatient stabilization. (AR 73.)

Plaintiffs cite no medical records to contradict BHS's conclusion that its acute inpatient stabilization criteria were not met, and a de novo review of the administrative record reflects that BHS's assessment was correct. BHS's acute inpatient stabilization criteria requires that

> [t]he patient must have a primary diagnosis of Anorexia Nervosa, Bulimia Nervosa, or Unspecified Feeding or Eating Disorder, as defined by the DSM-5, and said diagnosis must be a covered condition under the applicable benefit plan. Diagnostic criteria must be documented by the treating provider within 24 hours of admission describing the patient's condition at the time of admission. In addition, all of the following must be met:
>
> 1. A current body weight of less than 75% ideal body weight and/or a body mass index (BMI) of <16; and
>
> 2. Significant active biomedical complications related to the eating disorder, including but not limited to electrolyte imbalances, cardiac arrhythmias, esophageal tear, orthostatic changes, and/or low blood pressure (<90/60 in adults or <80/50 in children/adolescents age 17 or less) for which treatment is not more appropriately provided on an inpatient medical floor (i.e. telemetry); and
>
> 3. Eating disorder symptoms and behaviors can be reasonabl[y] expected to significantly improve with treatment at the acute inpatient level of care.

(Id.) Treatment records from Remuda Ranch indicate that A.K. weighed 103 pounds when admitted, which was 82.4% of her ideal weight of 125 pounds. (AR 259–60.) She was diagnosed with Anorexia Nervosa, her body mass index was 17.14, and she was diagnosed with bradycardia. (AR 346.) Her supine blood pressure was 105/66, and her standing blood pressure was 110/70. (Id.) Even if bradycardia were considered a "significant active biomedical complication[,]" BHS's acute inpatient criteria were not met because A.K.'s weight was not less than 75% of her ideal body weight and her body mass index was above 16. Therefore, BHS did not err in concluding that A.K.'s treatment at Remuda Ranch did not meet its acute inpatient stabilization criteria and would not be covered.

## IV.  Conclusion

For these reasons, Plaintiffs' motion for judgment on the administrative record (Doc. No. 65) is denied and the motions for judgment on the administrative record filed by AFC (Doc. No. 59), BHS (Doc. No. 61), and BCBSAL (Doc. No. 63) are granted.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE